Cite as 2023 Ark. App. 219

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-22-676

| | |
|---|---|
| | Opinion Delivered April 12, 2023 |
| JUSTIN RICHIE | |
| APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, EIGHTH DIVISION [NO. 60JV-20-585] |
| V. | |
| | HONORABLE TJUANA C. BYRD, JUDGE |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | |
| APPELLEES | REVERSED AND REMANDED |

**MIKE MURPHY, Judge**

Justin Richie appeals the July 27, 2022 order terminating his parental rights to his two children, MC1 and MC2 (ages four and two at the time of termination). On appeal, he argues that the grounds pleaded do not support the termination of his parental rights and that termination of his parental rights was not in the children's best interest. We reverse and remand.

MC1 and MC2 were taken into custody of the Arkansas Department of Human Services (DHS) in August 2020 when they were removed from the custody of their mother, Natalie Edwards, due to her drug use. Justin was named as a putative father. The children were subsequently adjudicated dependent-neglected, but the court explicitly stated that the children were not removed from Justin's custody, and it was declining to address if he

contributed to the dependency-neglect or his fitness. Justin did not participate in the first review hearing but was present for the second review hearing, which took place in April 2021. At this hearing, he was named a father of MC1 and MC2 and added as a defendant to the case.

A permanency-planning hearing was held in August 2021. Although he was found to be MC1 and MC2's parent, Justin was not represented by counsel. At that hearing, he testified that he had allowed Natalie to live with him some while she was homeless but that she was not living with him at the time of the hearing. He explained that he missed his psychological evaluation and parenting classes because of work. His home study was not approved because he was allowing Natalie to stay with him. He said that he has been sober since his release from prison four years ago for possession of controlled substance. He is on parole and submits to random drug screens for parole. The court ultimately found that Justin was in partial compliance but still changed the goal of the case to adoption.

DHS and the attorney ad litem filed a joint petition to terminate the parental rights of both parents, but at the termination hearing, Justin still had not been appointed counsel. The court terminated Natalie's parental rights and continued the matter as it pertained to Justin. On March 7, 2022, the ad litem, on behalf of the children, petitioned to terminate Justin's parental rights, alleging the grounds of subsequent factors and aggravated circumstances.

The court heard from several witnesses at the termination hearing.

Justin testified that he lives in North Little Rock, and he used to be in a relationship with Natalie. He said their relationship was rocky and centered on drug use. When DHS told him, around January or February of 2022, that his relationship with her was a barrier to getting his kids back, he said that he had no intention of being around her anymore and would get a restraining order if necessary. He admitted that, around October of 2021, he thought of Natalie as "the one" (and had posted about it on Facebook), but that since then, he has spoken a lot with his counselor and mentors, and everyone has impressed on him that if he wants his children back, he cannot have Natalie around. He testified that he now understands having her in the children's lives is not good for them.

He testified that his sobriety date is September 26, 2021. He began inpatient drug treatment that day and completed the treatment on October 27, 2021. He then actively participated in an intensive outpatient program, and he still attends NA meetings. He has completed every requirement DHS has asked of him and he testified that he has a great relationship with the children's current and former foster parents.

Justin has two other children ages ten and thirteen. He shares custody of those children with their mother. They lived with him before the COVID-19 pandemic, but he was not able to facilitate both Zoom school with them and work, so they went to live with their mother. He has them every weekend, there are no restrictions, and they have never been taken from him.

Justin is a foreman for a plumbing company; he makes twenty-five dollars an hour; he is current on his bills; he has reliable transportation and a driver's license with no

restrictions; and he is active at New Life Church. He said he is on parole from a charge four years ago, but it will be finished in about a month. He had only one violation in that entire time, and when he completed rehab, he was placed back on parole without restrictions. He is randomly drug screened as a part of his parole. He has a support system in place and completed counseling the week before.

Dr. George DeRoeck testified next. He testified that he conducted a psychological evaluation on Justin on January 18, 2022. At that time, Justin self-reported that he and Natalie had been separated for twelve months. Dr. DeRoeck said that if he had known Justin and Natalie had actually been together during that time, it would have changed his evaluation. He diagnosed Justin with avoidant antisocial disorder. He said that due to the volatility of Justin and Natalie's relationship, Justin's reunification with the children should be a slow process, six to eight months from the time Justin achieved sobriety.

The court also heard from Amanda Joshlin, a social worker who completed Justin's home study a year earlier. She said that the only reason the home study was denied was because Natalie was living there. She was concerned Justin did not seem to understand the problem with having Natalie there. Courtney Parnell, the CASA advocate, said that Justin had told her in January 2022 that he was not in a relationship with Natalie. Courtney's concern was that Natalie might show back up if they were to go home with Justin. She also said Justin's visits with the children were appropriate.

James Skelton, Justin's peer-support specialist and the executive director of Natural State Recovery Centers; and Dwight Merritt, Justin's therapist, both testified to Justin's

commitment to sobriety and his children, his overall stability, and his lack of a relationship with Natalie. Merritt testified that he did not know exactly when Justin's relationship with Natalie ended but that they spoke of it as it related to his past.

Jamie Tacito, a caseworker for Connected Foster Care (a private foster agency contracted by DHS), testified that Justin has made almost every visit with his children, there is a bond between the children and Justin, and that Justin is always prepared and appropriate at the visits. She said he is a proactive parent and asks if there is anything else he can be doing, without prompting. Justin has had six unsupervised visits with the children, and she supports reunification. Melissa Trotter, the current DHS caseworker on the case, stated Justin had completed all services ordered, and she believes it is in the children's best interest to be reunified with their father and that his rights not be terminated. She said that she had been assigned the case the month before, and Justin's home had not been evaluated by DHS since April 2021, but she would personally go to Justin's house after the hearing to perform a walk through. Melissa developed her opinion after speaking with the former DHS caseworkers on the case and the foster parents.

At the conclusion of the evidence, the court terminated Justin's parental rights. It found that the ad litem had proved the grounds in the petition by clear and convincing evidence. From the bench the court explained that

> [s]ervices were ordered in the case and of significance then and throughout the case was the long-term relationship between Mr. Richie and Ms. Edwards, and that relationship was and has been described as toxic, unhealthy and even identified as a drug relationship. These two have a history of using drugs together, and the best interest of these children has to be the paramount concern of this Court.

My findings weigh heavily on Mr. Richie's credibility, his judgement, and his insight, and by most accounts, the visits with his children go very well, and the evidence before the Court is that he has done the services. The concern of the Court, however, is that Mr. Richie did not give the same account of his sobriety or his relationship with Ms. Edwards in his psychological evaluation, his drug and alcohol assessment or in a therapeutic setting. All of the dates and the contacts are inconsistent in each of those various reportings.

I have no firm sense of when or if the relationship with Ms. Edwards ended, as even after indicating Mr. Richie realized the relationship was toxic and not good for him, there is some evidence via social media that he has -- well he identified her as "the one." His therapist, Mr. Merritt, was not certain if Mr. Richie and Ms. Edwards were in a relationship or not. He felt like Mr. Richie had made some acknowledgments about the unhealthiness of the relationship, but he couldn't with certainty say either what the level of the relationship was.

Ultimately, I have to consider the long term health safety and welfare of these children, and I, quite frankly, find that there are many ways that Mr. Richie could have shown the Court and/or the Department that has completely separated from a women he believed was the one, with whom he had on and off-again relationship with for nearly two years and who's rights have been terminated as against these children.

I find that Mr. Richie has made efforts to check the boxes, but I know that he has not been credible regarding his relationship with Ms. Edwards and his sobriety during this case. Mr. Richie ultimately then has not done what is necessary to show that he is a fit parent with the judgement and insight necessary to protect these children on a long-term basis, and this Court cannot leave these children with Mr. Richie and just go away.

The Court finds that it is in the best interest that the termination petition be granted, finding that they are adoptable, based on the testimony by Elizabeth Oldridge, that there are some 158 possible resources with the two as a sibling group data matching, and the only barrier to adoption is the termination of parental rights. These children are at substantial risk of further instability, exposure to the toxic relationship with Ms. Edwards and Mr. Richie and then potential drug exposure because placing them with him could very potentially be the same as placing them with Ms. Edwards, and so the Court does then grant the termination[.]

6

The resulting order recited that the subsequent-factors ground found at Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii)*(a)* (Supp. 2021) and the aggravated-circumstances ground found at Arkansas Code Annotated section 9-27-34l(b)(3)(B)(ix)*(a)(3)* support termination and that termination is in the children's best interest. The order specifically recites that

> Justin Richie has had ample opportunity and services to demonstrate a sustained benefit from the services provided that were designed to make him a fit parent. However, the Court finds that Justin Richie is not credible regarding his relationship with Natalie Edwards or the dates regarding his sobriety. The conflicting testimony regarding his relationship was abundant and this Court finds that placing custody of [MC1] and [MC2] with Justin Richie is akin to placing custody back with Natalie Edwards. Justin Richie testified that his relationship ended with Natalie around the end of January or February of 2022. He also testified that he remembered posting on the social media site, Facebook, in the fall of 2021, that Natalie was "the one" because at that time they were still in a relationship. He also posted a picture of them together in January 2022 at a recovery meeting and testified that he would visit her about once each month when she was in treatment. The testimony from Dr. George DeRoeck, who conducted the psychological evaluation, was that Justin Richie reported he had been separated from Natalie Edwards for twelve (12) months. Additionally, Dr. DeRoeck testified about the significance that Justin Richie did not report that Natalie's rights had been terminated and reported he was "unaware if she was working the case." Dr. DeRoeck diagnosed Justin with anti-social personality traits and testified that he was not forthcoming during the evaluation. Testimony from the CASA advocate, whom this Court finds credible, was that a staffing was held in February 2022 and at that time Justin Richie was insistent that he cut off ties with Natalie Edwards as soon as her parental rights were terminated in November 202l. The CASA advocate testified that Justin Richie always maintained in his conversations with her that he did not have contact with Natalie. Justin Richie's therapist, Dwight Merritt, testified that he had been seeing Justin for twelve (12) weeks. He testified that he thought Justin had ties to Natalie in the beginning of their sessions but believes that he cut ties with her at some point. Dwight Merritt was uncertain about when the relationship between Justin and Natalie ended.

> Since the inception of this case there has been extensive evidence regarding the lengthy and toxic relationship between Justin Richie and Natalie Edwards. The relationship is drug-fueled and Ms. Edwards is a trigger for Mr. Richie. Today, the

Court does not find Justin Richie credible regarding whether or not he is still in a relationship with Natalie Edwards. Continuing with therapy repeating a psychological evaluation, and offering more services would be of little benefit to this family. Justin Richie has checked all the boxes, but is not honest regarding basic facts that are paramount to the safety of his children. He gives a different date regarding when his relationship ended with Ms. Edwards nearly each time he is asked. The juveniles have been in foster care for nearly two (2) years and there are many ways Justin Richie could have demonstrated he was not in a relationship with Ms. Edwards, but instead the evidence shows they have continued their "on again off again" relationship throughout the duration of this case.

Justin appeals and argues that the termination is supported by neither grounds nor best interest. We agree with Justin that this record lacks clear and convincing evidence of grounds to support termination or that termination is in the children's best interest.

In order to terminate parental rights, the trial court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii) (Supp. 2021). The order terminating parental rights must also be based on a showing by clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B). However, only one ground must be proved to support termination. *Best v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 485, 611 S.W.3d 690.

A trial court's order terminating parental rights must be based upon findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3). Clear and convincing

evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Posey v. Ark. Dep't of Health & Hum. Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007). On appeal, the appellate court reviews termination-of-parental-rights cases de novo but will not reverse the trial court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the trial court to judge the credibility of witnesses. *Mason v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 124, at 2, 642 S.W.3d 260, 262.

The subsequent-factors ground requires the moving party to prove the following elements: (1) that other factors or issues arose, (2) that those factors or issues arose after the petition was filed, (3) that those factors or issues prevented the juveniles' placement with a parent; (4) that appropriate family services were offered; and (5) that the parent manifested the incapacity or indifference to remedy the subsequent factors or issues. Ark. Code Ann.§ 9-27-341(b)(3)(B)(vii)*(a).*

The aggravated circumstances ground requires that a parent is found by a court of competent jurisdiction to have subjected any juvenile to "aggravated circumstances" defined as (1) a determination by a judge that there is little likelihood that any further services to the family would result in reunification. Ark. Code Ann § 9-27-341(b)(3)(B)(ix)*(a).*

9

The major issue the court had with returning the children to Justin was the court's uncertainty about Justin's past with Natalie and his credibility on when that relationship ended. It was concerned he was still in a relationship with Natalie, and it did not find Justin credible on the subject. A credibility finding, however, is not synonymous to a finding that further services would not result in reunification or that Justin was incapable or indifferent remedying the barriers to reunification. To the contrary, the only evidence on this record was that once DHS clearly explained to Justin that continued contact with Natalie was keeping him from his children, Justin took significant and measurable steps to cut ties with her. He sought advice from his therapist and support network, and every witness to testify stated that Justin and Natalie were not presently in a relationship. Justin had achieved unsupervised visitation. By all accounts, Justin is the opposite of an indifferent parent who cannot benefit from services. The grounds for termination are not supported by clear and convincing evidence.

For the same reasons, we also hold that the court's best-interest finding is unsupported. We have said it so frequently that it is now axiomatic: few consequences of judicial action are so grave as the severance of natural family ties. *See Meyers v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 614, 533 S.W.3d 654. The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. *Rhine v. Ark. Dep't of Hum. Servs.*, 2011 Ark. App. 649, 386 S.W.3d 577. A termination of parental rights is both total and irrevocable—it leaves the parent with no

right to visit or communicate with the child, or to participate in, or even to know about, any important decision affecting the child's religious, educational, emotional, or physical development. *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18 (1981). As long as there is reason to believe that positive, nurturing parent-child relationships exist, the law favors preservation, not severance, of natural familial bonds. *Mason v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 124, at 17, 642 S.W.3d 260, 270.

On this point, *Mason*, is persuasive. In *Mason*, the trial court's biggest concern was the father's relationship with a girlfriend he had during the pendency of the case. She had prior felony and misdemeanor drug convictions. We wrote that

> [w]hile we share the trial court's concern about this relationship, the record shows that Miranda no longer lives with Venson and has her own residence. There was also no evidence that, during C.M.'s trial home placement with Venson, Miranda had ever spent the night there. The exact status of their relationship is unclear, and the record does not show that either the trial court or DHS informed Venson that preservation of his parental rights depended on his termination of this relationship. In light of the unrefuted evidence of Venson's compliance, progress, and close bond with C.M., we conclude that his association with Miranda cannot justify the trial court's order severing Venson's parental rights.

Like in *Mason*, given Justin's compliance, progress, and bond with his children, we cannot say that his past relationship with the mother of his children necessarily justifies severing his parental rights. There is no evidence that any real risk of potential harm exists because of this prior relationship, or that the children's best interest would be served by having their father permanently and irrevocably removed from their lives. Having considered the evidence before us, we find clear error in the trial court's termination of Justin's parental rights, and we reverse and remand.

11

Reversed and remanded.

HARRISON, C.J., and BARRETT, J., agree.

*Dusti Standridge*, for appellant.

*Dana McClain*, attorney ad litem for minor child.